UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

DAVE MUSCUTT                                                                            PLAINTIFF

v.                                                                    CIVIL ACTION NO. 3:12-CV-00181-CRS

ALLSTATE PROPERTY & CASUALTY                                                            DEFENDANT
INSURANCE COMPANY

## MEMORANDUM OPINION

This matter is before the Court on Defendant Allstate Property & Casualty Insurance Co.'s ("Allstate") Motion for Summary Judgment (DN 39) and Plaintiff Dave Muscutt's Motion to Amend Response of Plaintiff to Motion for Summary Judgment (DN 46).[1]  For the following reasons, the Court will grant Plaintiff's motion to amend his response and also grant Allstate's motion for summary judgment.

**I.      BACKGROUND**

In 2007, Plaintiff Dave Muscutt purchased a residence at 4704 Silverado Place in Louisville, Kentucky.  (Muscutt Dep., DN 36, at 9–10).  The foundation of that residence rests near the water table, making it highly susceptible to water damage from ground water intrusions.  (Muscutt Aff., DN 46-3, ¶ 5).  To prevent such water damage, the residence was equipped with a sump pump, which removes water around the basement and foundation by pushing it through a line that leaves the house.  (Muscutt Dep., DN 36, at 17–19, 85).

---

[1] As a preliminary concern, the Court will resolve Plaintiff's motion to amend his response (DN 46).  Here, Plaintiff merely wishes to make some stylistic and technical revisions to his initial response, and Allstate filed no objection to this motion.  Therefore, the Court will grant Plaintiff's motion to amend his response.  The Court considered the amended version of Plaintiff's response in reaching its conclusions on Allstate's motion for summary judgment.

-1-

During the night, on March 8, 2011, the area surrounding Plaintiff's residence experienced what both parties characterize as a typical spring rain. (Muscutt Dep., DN 36, at 67). The next morning, on March 9, Plaintiff awoke to find approximately eighteen inches of standing water in his basement. (Muscutt Aff., DN 46-3, ¶ 10). The sump pump was completely submerged and was not operating. (Muscutt Dep., DN 36, at 70).

Plaintiff hired Davis & Davis Plumbing, Inc. ("Davis & Davis") to investigate the water intrusion and remedy the problem. (Muscutt Dep., DN 36, at 75–77). Davis & Davis first found that the circuit breaker for the sump pump had tripped, shutting off its power source. (Davis & Davis Invoice, DN 36-6, at 1). When electricity was restored, however, the sump pump still did not respond. (Davis & Davis Invoice, DN 36-6, at 1). Davis & Davis and Plaintiff's plumbing expert, Brian Beyer, determined that the sump pump's check valve had seized, which then precipitated the failure of the sump pump system. (Davis & Davis Invoice, DN 36-6, at 1); (Davis Dep., DN 37, at 11–12); (Beyer Aff., DN 46-4, ¶ 10).

A check valve is a feature of the sump pump plumbing system. (Davis Dep., DN 37, at 12); (Beyer Aff., DN 46-4, ¶ 5). When functioning properly, a check valve prevents water from reentering the sump pump and sump pump well once it has been expelled through the outside line. (Davis Dep., DN 37, at 12); (Beyer Aff., DN 46-4, ¶ 12). But, if the check valve becomes seized, it can impede the flow of water from the sump pump, causing the pump to overwork and eventually malfunction. (Davis Dep., DN 37, at 11–12); (Beyer Aff., DN 46-4, ¶ 10). The necessary repairs to Plaintiff's plumbing system required replacement of the check valve and the overworked sump pump. (Davis Dep., DN 37, at 11–12); (Davis & Davis Invoice, DN 36-6, at 1).

At the time of the water intrusion, Plaintiff held insurance under Allstate's Homeowners Policy. (Muscutt Dep., DN 36, at 30–33); (Form APC220, DN 36-1). On the same day that Plaintiff discovered the water in his basement, March 9, 2011, he contacted Allstate to file an insurance claim for the damage to his house and personal property. (Muscutt Dep., DN 36, at 84). On March 11, 2011, Allstate conducted a field inspection of Plaintiff's residence. (Muscutt Dep., DN 36, at 93–97). During that field inspection, Robert Garwood, an Allstate representative, informed Plaintiff that the Homeowners Policy did not cover the water damage. (Muscutt Dep., DN 36, at 93–97). Garwood confirmed Allstate's denial of Plaintiff's claim in a March 11 letter, also providing the specific exclusions relied upon by the insurer. (Muscutt Dep., DN 36, at 93–97, 101–02); (Garwood Letter, DN 36-7, at 1).

Plaintiff then filed this lawsuit in Jefferson County Circuit Court. (Compl., DN 1-2). First, Plaintiff alleges that Allstate refused to cover his property losses in violation of the parties' insurance contract. Second, he alleges that Allstate's denial of coverage constituted bad faith under both the common law and the Kentucky Unfair Claims Settlement Practices Act ("KUCSPA"), KRS 304.12-230.

On April 5, 2012, Allstate removed the case to this Court, basing subject matter jurisdiction solely on diversity of citizenship. (Pet. for Removal, DN 1). On May 11, 2012, the Court bifurcated and held in abeyance Plaintiff's extra-contractual claims until resolution of the underlying coverage issue. (Order, May 11, 2012, DN 7). Allstate now calls upon this Court to grant summary judgment in its favor on all of Plaintiff's claims.

## II. STANDARD

The Court shall grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a). The party seeking summary judgment bears the initial burden of explaining the basis of its motion and demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). That burden may be satisfied only by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the . . . presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1). Should the movant meet its burden, the nonmoving party may not simply rest on its prior pleadings; it must produce further evidence showing a genuine issue for trial. *Celotex*, 477 U.S. at 324.

When considering a motion for summary judgment, the Court must view the facts and draw reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). Even so, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient . . . ." *Id.* at 252.

### III. DISCUSSION

#### A. Scope of Coverage

The critical issue in this case is whether the losses suffered by Plaintiff constitute covered losses under the terms of the Homeowners Policy. "Interpretation and construction of an insurance policy is a matter of law for the court." *Kemper Nat'l Ins. Cos. v. Heaven Hill Distilleries, Inc.*, 82 S.W.3d 869, 871 (Ky. 2002). An insurance policy containing clear and

unambiguous terms shall be enforced as written. *Id.* at 873. Nevertheless, the insurer must be held "strictly accountable" for the chosen language because it drafts the policy in every detail. *St. Paul Fire & Marine Ins. Co. v. Powell-Walton-Milward, Inc.*, 870 S.W.2d 223, 227 (Ky. 1994). Therefore, where provisions are in conflict or a term is susceptible to two reasonable interpretations, the ambiguity will be resolved in favor of the insured. *Id.* at 226–27. An ambiguity may be apparent on the face of the policy or when the terms are applied to a particular claim. *Id.* at 227.

Though strict construction of an insurance policy may sometimes facilitate coverage, that rule "certainly does not mean that every doubt must be resolved against [the insurer]." *Id.* at 226; *Stone v. Ky. Farm Bureau Mut. Ins. Co.*, 34 S.W.3d 809, 810–11 (Ky. App. 2000). Strict construction does not override a court's duty to ensure that a contract receives a reasonable interpretation based on the plain meaning of its language and the parties' object and intent. *St. Paul*, 870 S.W.2d at 226; *Stone*, 34 S.W.3d at 810–11.

The first step in determining the scope of coverage is to examine the language of the insurance policy. *Kemper*, 82 S.W.3d at 871. Here, Allstate's Homeowners Policy begins by establishing insurance coverage over a broad range of property in three defined categories—Coverage A, Coverage B, and Coverage C. The Homeowners Policy then shapes and limits that initial coverage through a series of exclusions.

While each coverage category contains specific limitations, brief descriptions will suffice for this discussion. First, Coverage A includes the insured's dwelling and attached structures. (Form APC220, DN 36-1, at 6). Second, Coverage B includes structures on the residential premises that are not attached to the dwelling. (Form APC220, DN 36-1, at 6–7). Third, Coverage C includes personal property owned or used by the insured. (Form APC220, DN 36-1,

at 7–10). Allstate will cover "sudden and accidental direct physical loss to property" described under those three coverage categories, "except as limited or excluded in this policy." (Form APC220, DN 36-1, at 7–8). Both parties assume, at least for the purposes of summary judgment, that the water in Plaintiff's basement did damage property protected by those initial coverage categories. Therefore, the dispositive issue is whether the exclusions remove Plaintiff's losses from the scope of coverage and prevent his recovery.

Allstate argues that several applicable exclusions eliminate its liability to Plaintiff. The three most relevant exclusions are all directed at water damage specifically and appear in item C of the exclusion provisions:

> C. **We** do not cover loss to property described in **Coverage A—Dwelling Protection**, **Coverage B—Other Structure Protection** or **Coverage C—Personal Property Protection** consisting of or caused by the following:
>
> 1. Flood, including, but not limited to, surface water, waves, tidal water or overflow of any body of water, or spray from any of these, whether or not driven by wind.
>
> 2. Water or any other substance that:
>    a) backs up through sewers or drains; or
>    b) overflows from a sump pump, sump pump well or other system designed for the removal of subsurface water which is drained from a foundation area of a structure.
>
> 3. Water or any other substance on or below the surface of the ground, regardless of its source. This includes water or any other substance which exerts pressure on, or flows, seeps or leaks through any part of the **residence premises**.

(Form APC220, DN 36-1, at 14–15).

Immediately following those exclusions, item D of the Homeowners Policy explains its approach to losses with multiple causes. (Form APC220, DN 36-1, at 16). The Homeowners Policy "does not cover loss to property" described in any of the three coverage categories "when . . . there are two or more causes of loss to the covered property; and . . . the predominant

-6-

cause(s) of loss is (are) excluded under items C.1 through C.11 above." (Form APC220, DN 36-1, at 16). The Court will discuss each of the abovementioned exclusions in the following subsections.

### 1. Flood Exclusion

Allstate contends that Plaintiff's property losses are excluded under item C.1, the flood exclusion. Item C.1 excludes from coverage any property loss "consisting of or caused by . . . [f]lood, including, but not limited to, surface water, waves, tidal water or overflow of any body of water, or spray from any of these, whether or not driven by wind." (Form APC220, DN 36-1, at 14–15). This flood exclusion is focused heavily on surface water and water movements that occur above the ground. Allstate likely included the flood exclusion to unquestionably eliminate coverage for common surface water intrusions, such as when rivers and streams overflow and water enters surrounding homes.

The flood exclusion could potentially apply to Plaintiff's losses in two ways. First, the Court could interpret "overflow of any body of water" to include a rise in the water table after rainfall. The second application would require use of the "but not limited to" phrase. That phrase could be read to exclude property damage caused by the infiltration of ground water, even though ground water and its movements are not alluded to in the list of examples. Based on the flood exclusion's specific terms and likely purpose, those applications are, at best, strained.

However, the Court need not rely on the flood exclusion to dispose of this case. The remaining water damage exclusions provide definite answers to the coverage question. Therefore, the Court will abstain from reaching a final determination on the flood exclusion's applicability to these facts.

### 2. Sump Pump Exclusion

Next, Allstate argues that item C.2, the sump pump exclusion, relieves it of liability on Plaintiff's claims. The pertinent portions of item C.2 exclude from coverage any property loss "consisting of or caused by . . . [w]ater or any other substance that . . . overflows from a sump pump, sump pump well or other system designed for the removal of subsurface water which is drained from a foundation area of a structure." (Form APC220, DN 36-1, at 14–15). Here, the check valve attached to Plaintiff's sump pump system seized, leading to a malfunction of the pump itself. The water, which overflowed from the sump pump, then damaged Plaintiff's basement and his personal property. The sump pump exclusion is clearly applicable to these facts and prevents coverage of Plaintiff's losses.

Plaintiff contends that the sump pump exclusion is inapplicable because the seizure of the check valve, not the sump pump's malfunction, constituted the predominant cause of his property losses. The Homeowners Policy does provide that, where two or more causes combine to produce a loss, the loss will not be covered if the "predominant cause" is excluded. (Form APC220, DN 36-1, at 16). However, the necessary assumption of Plaintiff's argument—that the check valve can be considered separate from the sump pump system—contradicts the contract terms and the evidence before this Court.

The sump pump exclusion does not merely eliminate coverage for losses caused by failure of the sump pump alone; it is a much broader provision. The sump pump exclusion also precludes coverage of any property loss caused by water overflowing from "other system[s] designed for the removal of subsurface water which is drained from a foundation area of a structure." (Form APC220, DN 36-1, at 14–15). The Homeowners Policy's use of the term

"system" permits the sump pump exclusion to encompass a wider array of causes for this type of property loss.

The check valve is a component of the sump pump plumbing system—a system designed to remove subsurface water from around the foundation of a structure. In fact, the check valve's sole purpose is dependent on the presence of a sump pump because it is designed to ease that pump's work. As an element of the plumbing system that overflowed, the seized check valve cannot be a separate, non-excluded cause under the Homeowners Policy. The Court will not undermine the unambiguous language and obvious purpose of the sump pump exclusion based on an artificial technicality.

Furthermore, Plaintiff produced no evidence that the check valve was an independent entity, and several factors in the record bolster the conclusion that it was part of the sump pump plumbing system. First, Davis & Davis stated that "[t]he whole [plumbing] system functions better with a check valve." (Davis Dep., DN 37, at 10). Second, Davis & Davis included replacement of the seized check valve in the price of installing a new sump pump. (Davis & Davis Invoice, DN 37-1, at 1). Third, Plaintiff's own expert plumber, Beyer, acknowledged that "the check valve . . . was part of his plumbing system at the time of the accident." (Beyer Aff., DN 46-4, ¶ 5).

Plaintiff also argues, though with less persistence, that an electrical outage was the predominant cause of the water intrusion, but Plaintiff does not support that argument with any evidence. In fact, substantial evidence points in the opposite direction. Beyer's statements again contradicted Plaintiff's argument. The expert explained that "[t]he accident at the Muscutt home . . . was not caused by an electrical problem. Otherwise there would have been other electrical problems in the home or neighborhood." (Beyer Aff., DN 46-4, ¶ 14). Moreover,

Davis & Davis found that Plaintiff's sump pump would not respond to electricity after its circuit breaker had been reset. (Davis & Davis Invoice, DN 36-6, at 1). In light of the contract terms and the evidence presented, Plaintiff's causation arguments concerning the sump pump exclusion lack merit. Therefore, the Court concludes that the sump pump exclusion eliminates coverage for Plaintiff's property losses.

### 3. Catchall Water Damage Exclusion

Additionally, Allstate asserts that Plaintiff's property losses are also excluded from coverage under the catchall water damage exclusion in item C.3. Item C.3 excludes from coverage any property loss "consisting of or caused by . . . [w]ater or any other substance on or below the surface of the ground, regardless of its source. This includes water or any other substance which exerts pressure on, or flows, seeps or leaks through any part of the **residence premises**." (Form APC220, DN 36-1, at 14–15). Several courts have considered this same catchall exclusion and interpreted it to clearly and unambiguously wipe out coverage for damage from water on or below the ground, without regard to whether the source is natural or artificial. *See Carver v. Allstate Ins. Co.*, 76 S.W.3d 901, 903, 905 (Ark. Ct. App. 2002) (interpreting the catchall exclusion to prevent coverage of water damage caused by a broken water main); *Olson v. Allstate Ins. Co.*, No. 2010-CA-000612-MR, 2011 WL 2693555, at *2–3 (Ky. App. July 8, 2011) (unpublished) (interpreting the catchall exclusion to prevent coverage of water damage caused by the rupture of an above-ground swimming pool).

Here, Plaintiff's losses resulted from ground water entering his basement and harming his house and personal property. That ground water certainly falls within the catchall exclusion's category of "water . . . below the surface of the ground." (Form APC220, DN 36-1, at 15). Again, Plaintiff argues that the causal effect of the check valve makes this exclusion

-10-

inapplicable, but that argument is not relevant under the catchall exclusion. The catchall exclusion eliminates coverage for any ground water damage, "regardless of its source." (Form APC220, DN 36-1, at 15). Whether the ground water entered Plaintiff's basement because of the seized check valve or through the failed sump pump is immaterial. The simple fact that ground water intruded on Plaintiff's residence and impaired his property is enough for the catchall exclusion to apply. Accordingly, the Court concludes that the catchall water damage exclusion also precludes coverage of Plaintiff's property losses.

### 4. Other Potential Exclusions

In reply to Plaintiff's arguments, Allstate raised two additional exclusions concerning weather conditions and wear and tear. (Def. Reply to Resp. to Mot. for Summ. J., DN 47, at 5–6). While those additional exclusions may have some potential applicability, their language does not speak directly to the present facts. The sump pump and catchall water damage exclusions go to the heart of this coverage issue, and because the Court has disposed of Plaintiff's claims there, it is unnecessary to further evaluate the weather conditions and wear and tear exclusions. Allstate is entitled to summary judgment on Plaintiff's claims for insurance coverage under the Homeowners Policy.

### B. Bad Faith

Finally, Allstate argues that Plaintiff's bad faith claims under the common law and KUCSPA, KRS 304.12-230, must fail because he lacks coverage for his losses under the Homeowners Policy. All bad faith claims, whether brought by a first-party claimant or third-party claimant, and whether based on the common law or statute, must satisfy a single test. *Davidson v. Am. Freightways, Inc.*, 25 S.W.3d 94, 100 (Ky. 2000). To prevail on a bad faith claim, the insured must prove three elements:

> (1) the insurer must be obligated to pay the claim under the terms of the policy;
> (2) the insurer must lack a reasonable basis in law or fact for denying the claim;
> and (3) it must be shown that the insurer either knew there was no reasonable
> basis for denying the claim or acted with reckless disregard for whether such a
> basis existed.

*Wittmer v. Jones*, 864 S.W.2d 885, 890 (Ky. 1993) (quoting *Fed. Kemper Ins. Co. v. Hornback*, 711 S.W.2d 844, 846–47 (Ky. 1986) (Leibson, J., dissenting)) (internal quotation marks omitted); *Ky. Nat'l Ins. Co. v. Shaffer*, 155 S.W.3d 738, 741–42 (Ky. App. 2004).

Plaintiff's bad faith claims falter on the first required element. As explained above, Allstate bears no contractual obligation to cover Plaintiff's property losses. Those losses are excluded from the scope of coverage by the sump pump exclusion and the catchall water damage exclusion. "Absent a contractual obligation, there simply is no bad faith cause of action, either at common law or by statute." *Davidson*, 25 S.W.3d at 100; *Shaffer*, 155 S.W.3d at 742. Therefore, Allstate is entitled to summary judgment on Plaintiff's common law and statutory bad faith claims.

## IV.  CONCLUSION

For the reasons stated above, the Court will grant Plaintiff Muscutt's Motion to Amend Response of Plaintiff to Motion for Summary Judgment (DN 46) and also grant Defendant Allstate's Motion for Summary Judgment (DN 39). A separate order and judgment will be entered this date in accordance with this Memorandum Opinion dismissing Plaintiff's action with prejudice.

September 9, 2014

Charles R. Simpson III, Senior Judge
United States District Court